**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                No. 94-5822

DENNY R. GULLETT,
Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
John T. Copenhaver, Jr., District Judge.
(CR-94-17)

Argued: November 3, 1995

Decided: February 12, 1996

Before MURNAGHAN, NIEMEYER, and HAMILTON,
Circuit Judges.

_____

Affirmed by published opinion. Judge Hamilton wrote the opinion, in
which Judge Murnaghan and Judge Niemeyer joined.

_____

**COUNSEL**

**ARGUED:** Rebecca Ann Baitty, LUTZ, WEBB, PARTRIDGE,
BOBO & BAITTY, Sarasota, Florida, for Appellant. Kelly D.
Ambrose, Assistant United States Attorney, Charleston, West Vir-
ginia, for Appellee. **ON BRIEF:** Rebecca A. Betts, United States
Attorney, Charleston, West Virginia, for Appellee.

_____

**OPINION**

HAMILTON, Circuit Judge:

On January 31, 1994, a federal grand jury sitting in the Southern District of West Virginia returned a one-count indictment charging the appellant, Denny Ray Gullett, with "maliciously damag[ing] and destroy[ing] and attempt[ing] to damage and destroy, by means of explosive, a building used in interstate commerce and an activity affecting interstate commerce, that is, rental property, . . . which resulted in the death of Masil Lee Hensley . . . in violation of Title 18, United States Code, Section 844(i)." (J.A. 10). Following a jury trial, Gullett was convicted. The jury found, by way of special interrogatory, that Gullett's conduct was the proximate cause of Masil Lee Hensley's death. On October 6, 1994, Gullett was sentenced to thirty-eight years' imprisonment. Gullett appeals his conviction and sentence. We affirm.

I

In December 1989, Gullett and Masil Hensley purchased, through a series of loans, a machine shop, known as Lee's Machine Shop. The machine shop, which was primarily engaged in the repair of mining equipment, was located near Chapmanville in Logan County, West Virginia. The responsibilities of the machine shop were divided between Gullett and Masil Hensley. Masil Hensley was responsible for the supervision of the actual repair of equipment while Gullett handled the financial aspects of the business, including the collection of accounts receivable and payments to creditors.

In the years following its establishment, the machine shop experienced financial difficulties and fell behind on its obligations to creditors. Eventually, Gullett became dissatisfied with the financial stability of the machine shop and made several unsuccessful attempts to sell the business.

In July 1992, Masil Hensley obtained, through the machine shop, a $150,000 "key man" life insurance policy, payable to the machine shop upon his death.[1] The policy was acquired at Gullett's urging, and

_____

[1] A key man insurance policy is an insurance policy that is secured on a valuable business employee. The proceeds of the insurance policy benefit the business.

2

although Masil Hensley originally arranged for his wife to be the beneficiary of the policy, Gullett convinced him to change the policy to make the machine shop the beneficiary.

On November 29, 1993, an explosion occurred in the parking lot adjacent to the machine shop. The explosion severely injured Masil Hensley and his nephew, Lonnie Hensley, an employee of the machine shop. In addition, Masil Lee Hensley, the son of Masil Hensley, suffered fatal injuries. The explosion also damaged the machine shop and rental property (a one-story white house) owned by the machine shop and located approximately twelve feet from the point of detonation.

Through its investigation, the government learned that in the early morning hours of November 29, 1993, Gullett telephoned Masil Hensley at his house, located next to the machine shop, and told Masil Hensley that he had asked Lonnie Hensley to come to his house before reporting to work to give him advice on the repair of his truck. Gullett asked Masil Hensley to punch Lonnie Hensley's time card so he would be paid as if he had reported to work at the usual time. Gullett then telephoned Lonnie Hensley and asked him to come to his house.

At approximately 7:45 a.m., Lonnie Hensley arrived at Gullett's house. After Lonnie Hensley examined Gullett's truck, he gave Gullett his opinion on the truck's mechanical problem. As Lonnie Hensley prepared to leave, Gullett told Lonnie Hensley that he had prepared a "gag gift" for Masil Hensley. Gullett then showed Lonnie Hensley a cardboard box with the top and one side removed. Inside the cardboard box, Lonnie Hensley saw a smaller box covered with packing tape. The smaller box had two plastic coated wires that protruded near the bottom of the box.

Although the cardboard box covered with packing tape contained four to six sticks of dynamite,[2] Gullett explained to Lonnie Hensley that the smaller box contained an inflatable doll having the body of Dolly Parton and the head of Ronald Reagan, and that the tape had

_____

[2] Expert testimony at trial established this fact.

3

been partially cut so that as the doll inflated, it could pop out of the box. Gullett further explained to Lonnie Hensley that the two wires, when connected to an automotive battery, would cause the doll to inflate and pop from the box.

Following this explanation, Gullett told Lonnie Hensley how to present the gag gift to Masil Hensley. Gullett told Lonnie Hensley to get Masil Hensley alone inside his house before connecting the wires to an automotive battery. Gullett also told Lonnie Hensley not to tell the other employees at the machine shop about the gag gift or to allow them to see it.

Lonnie Hensley placed the cardboard box in his truck and transported it to the parking lot adjacent to the machine shop. He parked his truck in the parking lot approximately twelve feet from the rental property owned by the machine shop. The machine shop was located approximately sixty feet from the location of Lonnie Hensley's truck, and as noted above, Masil Hensley's house was located adjacent to the machine shop.

Contrary to Gullett's instructions, Lonnie Hensley entered the machine shop and told Masil Lee Hensley about the gag gift that Gullett had concocted for Masil Hensley. Lonnie Hensley and Masil Lee Hensley then approached Masil Hensley and told him what Gullett had sent him. Masil Hensley told them that he did not have time to see the gag gift because he was preparing to leave the machine shop to make an equipment delivery. They, however, followed Masil Hensley out of the machine shop and convinced him to look at the gag gift in the parking lot of the machine shop.

The three men walked to Lonnie Hensley's truck, and the cardboard box was removed and placed on the parking lot. Lonnie Hensley removed the battery from his truck and placed it in the cardboard box next to the smaller box covered with packing tape. He knelt beside the cardboard box to connect the wires to the battery, while Masil Hensley stood approximately five feet away observing the process. Masil Lee Hensley was waving a towel over the package and joking about what was contained in the cardboard box.

At the instant the wires protruding from the smaller box covered with packing tape connected to the battery, the package exploded vio-

4

lently, resulting in injuries to Masil Hensley and Lonnie Hensley, Masil Lee Hensley's death, and damage to the machine shop and the rental property owned by the machine shop and located approximately twelve feet from the point of detonation.

Gullett was charged in a one-count indictment with "maliciously damag[ing] and destroy[ing] and attempt[ing] to damage and destroy, by means of explosive, a building used in interstate commerce and an activity affecting interstate commerce, that is, rental property, . . . which resulted in the death of Masil Lee Hensley . .. in violation of Title 18, United States Code, Section 844(i)." (J.A. 10). The government's theory at trial was that Gullett intended to kill Masil Hensley through a contained explosion in Masil Hensley's residence so that the machine shop could collect on the $150,000 key man life insurance policy. Testimony at trial established that, had the bomb exploded in Masil Hensley's residence as planned, the explosion would have killed Masil Hensley and Lonnie Hensley and destroyed all evidence of wrongdoing. The jury convicted Gullett and found, by way of special interrogatory, that Gullett's conduct was the proximate cause of Masil Lee Hensley's death. Gullett was sentenced to thirty-eight years' imprisonment and filed a timely notice of appeal.

II

A

Prior to trial, Gullett moved to suppress evidence of certain nonverbal responses (consisting of affirmative and negative nods of the head) he made to federal agents prior to his arrest. Following a suppression hearing, the government informed the district court that this evidence would not be used in its case-in-chief. In light of the government's stated intent, the district court declined to address whether the federal agents obtained Gullett's nonverbal responses in violation of Miranda v. Arizona, 384 U.S. 436 (1966); instead, the district court ruled that, even if the nonverbal responses were obtained in violation of Miranda, the nonverbal responses were made knowingly and voluntarily, and were trustworthy, and therefore, could be used for impeachment purposes if Gullett took the stand at trial, see Harris v. New York, 401 U.S. 222, 225-26 (1971) (evidence obtained in viola-

5

tion of <u>Miranda</u> may be used for impeachment purposes at trial); <u>see also Oregon v. Hass</u>, 420 U.S. 714, 722 (1975).

At trial, Gullett testified on direct examination that, on the day of the explosion, he never gave Lonnie Hensley a package or box containing an explosive and that he had no knowledge of any gag gift or inflatable doll. He further denied trying to kill Lonnie Hensley or Masil Hensley and denied knowledge of how to prepare a bomb.

In response to Gullett's trial testimony, the government introduced the testimony of Agent Kemp. Agent Kemp testified that prior to Gullett's arrest Gullett nodded his head in a negative manner after being asked whether he intended to kill anybody and nodded his head in an affirmative manner after being asked whether the bomb was a prank.

Gullett contends that the district court erroneously allowed the government to impeach him at trial with the nonverbal responses he gave to Agent Kemp while being questioned prior to his arrest. We disagree.

Because Gullett did not object to the admission of Agent Kemp's testimony, we review for plain error. <u>See</u> Fed. R. Crim. P. 52(b). Under the plain error standard, we must determine whether there was: (1) error; (2) that was plain; (3) that affected the defendant's substantial rights; and (4) that "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." <u>United States v. Olano</u>, 113 S. Ct. 1770, 1776-79 (1993) (citation and internal quotes omitted).

We believe the district court did not commit error, let alone plain error. The Supreme Court has explained that statements obtained in violation of <u>Miranda</u>**3** may be used on cross-examination to impeach the defendant who made them. <u>See Harris</u>, 401 U.S. at 225-26. The Court in <u>Harris</u> stated that "[t]he shield provided by <u>Miranda</u> cannot be perverted into a license to use perjury" and avoid "the traditional truth-testing devices of the adversary process." <u>Id.</u>

_____

**3 <u>Arguendo</u>**, we will assume Gullett's nonverbal responses were obtained in violation of <u>Miranda</u>.

6

In this case, Gullett opened the door on direct examination to the content of the statements he made. The testimony of Agent Kemp was elicited to attack Gullett's credibility and, as such, was proper impeachment. Gullett's testimony on direct examination that he: (1) never gave Lonnie Hensley a package or box containing an explosive; (2) had no knowledge of any gag gift or inflatable doll; and (3) had no knowledge of how to prepare a bomb was in direct contrast to Agent Kemp's testimony that Gullett nodded his head in an affirmative manner after being asked whether the bomb was a prank. In addition, because the substance of Gullett's direct examination was to deny all knowledge of the events surrounding the explosion, the government was free to introduce Agent Kemp's testimony that Gullett nodded his head in a negative manner after being asked whether he intended to kill anybody. Once Gullett testified on direct examination, Miranda's shield no longer protected him against the government's use of his prior inconsistent statements for impeachment purposes; thus, the government was free to use Agent Kemp's testimony for the limited purpose of impeaching Gullett's credibility. The district court did not err in admitting Agent Kemp's testimony.

B

In a related argument, Gullett contends that the district court's instruction to the jury regarding its consideration of his nonverbal responses deprived him of a fair trial. Because Gullett did not object to the court's instructions, we again review for plain error. See Fed. R. Crim. P. 52(b). The district court instructed the jury:

> Where a defendant, by his earlier statement or other conduct, admits some fact against his interest, then such statement or other conduct, if any there be and if knowingly made or done, may be considered as evidence of the truth of the facts so admitted.

> Any such statement or conduct, if any there be, may also be considered for purposes of judging the credibility of a defendant as a witness.

(J.A. 417).

7

Gullett contends that this instruction allowed the jury to consider Gullett's statements as substantive evidence of guilt rather than for impeachment purposes only. We need not resolve whether the district court committed error in this regard. Assuming that this instruction was error that was plain, Gullett cannot satisfy Olano's third requirement that the error affected his substantial rights. In Olano, the Court explained that "in most cases [the plain error standard's third requirement] means that the error must have been prejudicial: It must have affected the outcome of the District Court proceedings." 113 S. Ct. at 1778. This standard is the functional equivalent of the harmless error standard, with the exception that the defendant, rather than the government, carries the burden of persuasion. Id. . In light of the overwhelming evidence of guilt and the fact that Gullett points to no prejudice flowing from the district court's instruction, we cannot conclude that the alleged error affected the outcome below. Accordingly, Gullett is entitled to no relief under Rule 52(b).

III

A

Gullett also challenges the sufficiency of the evidence to support his conviction. The standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

To maintain a prosecution under 18 U.S.C. § 844(i),[4] the government must prove that the defendant: (1) maliciously; (2) damaged or destroyed a building, vehicle, or other real or personal property; (3) by means of fire or explosive; and (4) the building, vehicle, or per-

_____

[4] Section 844(i) provides in pertinent part:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years. . . .

sonal or real property was used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce. <u>United States v. Nguyen</u>, 28 F.3d 477, 480 (5th Cir. 1994); <u>United States v. Triplett</u>, 922 F.2d 1174, 1177 (5th Cir.), <u>cert. denied</u>, 500 U.S. 945 (1991).

At trial, Gullett stipulated that the rental property was used in an activity affecting interstate commerce, <u>see Russell v. United States</u>, 471 U.S. 858, 859-62 (1985) (rental properties constitute a sufficient nexus to interstate commerce for federal jurisdiction to attach under section 844(i)); <u>United States v. Parsons</u>, 993 F.2d 38, 40 (4th Cir.) (rented single-family dwelling falls within section 844(i)), <u>cert. denied</u>, 114 S. Ct. 266 (1993); <u>United States v. Medeiros</u>, 897 F.2d 13, 16 (1st Cir. 1990) ("<u>Russell</u> thus holds that rental property is <u>per se</u> used in an activity affecting interstate commerce."); accordingly, the fourth element was satisfied. The government also presented evidence that the rental property was damaged by an explosive device, namely, the cardboard box wrapped in packing tape that contained dynamite; accordingly, elements two and three were satisfied.

We are left with the question of whether the government produced sufficient evidence to satisfy the malice element. Gullett contends this element could only be satisfied with proof that he intended to damage the rental property. We disagree.

Our construction of the term "maliciously" as employed in section 844(i) is guided by two principles of statutory interpretation. First, if Congress uses a common-law term in a federal criminal statute without defining it, we must presume that Congress adopted the common-law definition of that term. <u>Morissette v. United States</u>, 342 U.S. 246, 263 (1952) ("And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the . . . meaning its use will convey to the judicial mind unless otherwise instructed."); <u>United States v. Everett</u>, 700 F.2d 900, 904 (3d Cir. 1983); <u>see also United States v. Harold</u>, 588 F.2d 1136, 1142 (5th Cir. 1979); <u>United States v. Guillette</u>, 547 F.2d 743, 749 (2d Cir. 1976), <u>cert. denied</u>, 434 U.S. 839 (1977). Second, we will not adopt the common-law meaning of the term if there are "grounds for inferring any affirmative instruction from Congress" to define it otherwise. <u>Morissette</u>, 342 U.S. at 273.

9

At common law, one acted "maliciously" if he or she acted intentionally or with willful disregard of the likelihood that damage or injury would result. See United States v. Sweet , 985 F.2d 443, 445 (8th Cir. 1993); McFadden v. United States, 814 F.2d 144, 146 (3d Cir. 1987). Because Congress did not define "maliciously" in section 844(i), we must presume Congress intended to employ the common-law definition unless there are "grounds for inferring any affirmative instruction from Congress" to define it otherwise. Morissette, 342 U.S. at 273. And, here, there are no grounds--e.g., from the language of the statute or legislative history--from which to conclude that Congress intended to adopt a different definition of"maliciously" than the term's common-law definition. Indeed, the legislative history of section 844 indicates that prosecutions under section 844(i) should be permitted except in the case of accidental damage. H.R. Rep. No. 1549, 91st Cong., 2d Sess, reprinted in 1970 U.S.C.C.A.N. 4007, 4046 (discussing a similar provision to section 844(i), section 844(f)). And "[p]rosecution for non-accidental damage is fully consistent with adoption of the common law meaning of the term `maliciously.'" McFadden, 814 F.2d at 146. Accordingly, the first element of section 844(i) is satisfied if the defendant acted intentionally or with willful disregard of the likelihood that damage or injury would result from his or her acts.

In this case, unquestionably, Gullett acted with willful disregard of the likelihood that damage to the rental property would result. There is no question that Gullett knew that the rental property was located close to Masil Hensley's house, the proposed site of the explosion. Thus, Gullett acted with a willful disregard of the likelihood that four to six sticks of dynamite would damage property close to the property he intended to destroy. In short, the government produced sufficient evidence to support the conviction.

B

In a related argument, Gullett contends the following instruction given to the jury constitutes reversible error because it allowed the jury to find him guilty without finding that he intended to damage the rental property:

> A defendant may not be excused from responsibility for the harmful consequences of his actions simply because that

10

harm was not precisely the harm in which he intended. That is, if the only difference between what a defendant intended to flow from his action and what actually occurred as a result of his action is that some property was damaged other than that which the defendant intended, the defendant, under the law, may still be held responsible to the same extent that he would have been responsible had the intended harm resulted, so long as the actual result is similar to and not remote from the intended result. Of course, the defendant must have acted maliciously and with specific intent, and the government must prove all of the essential elements of the offense beyond a reasonable doubt in order for you to find the defendant guilty.

(J.A. 421).

The challenged instruction is a correct statement of the law because, as noted earlier, the government was not required to prove that Gullett intended to damage the rental property. Rather, the government was required, at a minimum, to prove that the damage was done with willful disregard of the likelihood that damage would result. Thus, the district court correctly instructed the jury that Gullett "may" be legally responsible for his actions even though "some property was damaged other than that which the defendant intended." Id.

IV

Gullett also argues that the district court erred in arriving at his sentence. First, he contends that the district court erred in its application of the Sentencing Guidelines. Second, Gullett contends that the district court exceeded statutory limits when it sentenced him to thirty-eight years' imprisonment. We find no merit to these contentions.

Addressing Gullett's contention that the district court erred in its application of the Sentencing Guidelines, we begin by noting that United States Sentencing Commission, Guidelines Manual (USSG), § 1B1.2 (Nov. 1993) directs the sentencing court to "[d]etermine the offense guideline section in Chapter Two (Offense Conduct) most applicable to the offense of conviction (i.e. , the offense conduct charged in the count of the indictment or information of which the

11

defendant was convicted)." "As a general rule, the court is to use the guideline section from Chapter Two most applicable to the offense of conviction." USSG § 1B1.2, comment. (n.1)."The Statutory Index (Appendix A) provides a listing to assist in this determination." Id.

The Statutory Index refers a sentencing court to USSG § 2K1.4 ("Arson; Property Damage by Use of Explosives") for violations of section 844(i). USSG § 2K1.4 does not contain an enhancement when death results from the commission of the arson or the use of the explosives. Instead, when death results, USSG § 2K1.4(c)(1) directs the sentencing court to apply the "most analogous" guideline offense from Chapter Two, Part A:

> If death resulted, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than that determined above.

Following these directives, the district court correctly applied the guideline for first degree murder, USSG § 2A1.1, because death resulted from the use of an explosive. See United States v. Prevatte, 16 F.3d 767, 781-82 (7th Cir. 1994) (USSG § 2A1.1 is the most analogous guideline if death results from the use of fire or explosives); United States v. El-Zoubi, 993 F.2d 442, 449 (5th Cir. 1993) (if death results from the use of fire, USSG § 2A1.1 is the most analogous guideline).[5] Under USSG § 2A1.1(a), Gullett's base offense level was

_____

[5] We find no merit to Gullett's contention that the district court's cross-reference to USSG § 2A1.1 deprived him of trial by jury for the charge of murder. The court in Prevatte rejected a similar contention, concluding:

> Section 844(i) is not the functional equivalent of first degree murder; it is an arson statute, with severe repercussions for the arsonist whose actions result in death of a human being. The court and the jury made the determination required by statute, nothing more. Nothing in the statutory language or history of § 844(i) suggests that the elements of the offense change when death results, and we shall not impose these additional burdens on the government absent statutory language to the contrary.

16 F.3d at 782 n.15.

12

forty-three, and the district court increased Gullett's offense level by two levels for obstruction of justice, USSG § 3C1.1.[6] Combined with a criminal history category of one, Gullett's guideline range was life.

At this point, the district court was free to depart downward as USSG § 2A1.1 authorizes a downward departure--but not below the offense level specified in USSG § 2A1.2 ("Second Degree Murder") --"[i]f the defendant did not cause the death intentionally or knowingly." USSG § 2A1.1, comment. (n.1). Gullett did not move for a downward departure and one was not warranted because the district court found that Masil Lee Hensley's death was a "premeditated killing . . . in which the defendant acted with malice." (J.A. 443).

However, the district court was not in a position to sentence Gullett to life imprisonment because, at the time Gullett's offense was committed, a person convicted under section 844(i) was subject to imprisonment:

> for not more than ten years . . . and if death results to any person, . . . as a direct or proximate result of conduct prohibited by this subsection, shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.[7]

The version of section 34 in effect at the time Gullett was sentenced stated:

> Whoever is convicted of any crime prohibited by this chapter, which has resulted in the death of any person, shall be subject also to the death penalty or to life imprisonment, if

_____

[6] The district court correctly applied the obstruction of justice enhancement because Gullett committed perjury during his testimony at trial. See United States v. Dunnigan, 113 S. Ct. 1111, 1116 (1993).
[7] In 1994, Congress amended section 844(i) to, among other things, eliminate the reference to section 34. Section 844(i) now provides, in pertinent part, that "if death results to any person, . . . as a direct and proximate result of conduct prohibited by this subsection, [the defendant] shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment."

13

the jury shall in its discretion so direct, or, in the case of a plea of guilty, or a plea of not guilty where the defendant has waived a trial by jury, if the court in its discretion shall so order.[8]

Courts interpreting the pre-1994 version of section 34 have held that, under the plain language of section 34, a life sentence may not be imposed absent jury direction. See United States v. Williams, 775 F.2d 1295, 1299 (5th Cir. 1985) ("[U]nder the clear meaning of the combination of sections 844(i) and 34, Williams may be sentenced by the district court only to `any term of years' and not to life imprisonment in the absence of a jury recommendation or jury waiver."), cert. denied, 475 U.S. 1089 (1986); United States v. Hansen, 755 F.2d 629, 631 (8th Cir.), cert. denied, 474 U.S. 834 (1985). Consequently, the district court did not have the authority to impose a life sentence under section 34, see, e.g., Williams , 775 F.2d at 1299, or the Sentencing Guidelines, see United States v. Holloway, 991 F.2d 370, 373 (7th Cir. 1993) ("[T]he Sentencing Guidelines cannot trump the edicts of the federal criminal statutes.").

The district court was left with its statutory obligation to impose a sentence for "any term of years." The district court interpreted section 34 as placing a limitation on its authority to impose a sentence that exceeded Gullett's life expectancy, reasoning that a life sentence could be imposed only when the jury so recommends. The district court also took the view that good-time credits, see 18 U.S.C. § 3624(b) (allowing fifty-four days a year of good-time credit), could be considered when imposing sentence. The district court calculated Gullett's life expectancy and found it to be 33.8 years.[9] The district court then sentenced Gullett to thirty-eight years' imprisonment, which when good-time credits are considered, see id., would result in a period of incarceration of 33.1 years.

_____

[8] In 1994, section 34 was amended. That section now reads "Whoever is convicted of any crime prohibited by this chapter, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life."

[9] Gullett does not attack this finding.

14

Gullett contends that, because his sentence exceeded his life expectancy, the district court sentenced him to life imprisonment, a sentence unauthorized by section 34 in the absence of a jury recommendation. Gullett's argument raises two interesting questions. First, under the pre-1994 version of section 34, could the district court impose a sentence exceeding the defendant's life expectancy? If not, could good-time credits be considered in determining whether a defendant's sentence exceeded his life expectancy?

In answering the first question, the far more difficult one, we begin by noting that courts have rejected similar, but not identical, challenges to the one raised by Gullett. See, e.g. , United States v. Berryhill, 880 F.2d 275, 277-78 (10th Cir. 1989) (upholding 300-year sentence for kidnapping), cert. denied, 493 U.S. 1049 (1990); Rothgeb v. United States, 789 F.2d 647, 651 (8th Cir. 1986) (upholding 210-year sentence for second-degree murder). These cases did not involve section 34, but more importantly, in each of these cases, the statute authorized life imprisonment, or in the alternative, imprisonment for a term of years. Berryhill, 880 F.2d at 277 (penalty for kidnapping, 18 U.S.C. § 1201, "any term of years or for life"); Rothgeb, 789 F.2d at 651 (penalty for second-degree murder, 18 U.S.C. § 1111(b), "any term of years or for life"). Thus, when the sentencing courts in Berryhill and Rothgeb chose one alternative over the other, there was no reversible error.

In contrast, in this case, section 34 functions "to deny [the] sentencer the power to impose a life sentence in a particular instance." United States v. Martin, 63 F.3d 1422, 1434 (7th Cir. 1995). Thus, "the absence . . . of a jury recommendation for a sentence of a life in prison disempowered the sentencing judge to choose between a life term and a term of years, so if he used a term of years to impose a life sentence he was evading a limitation on his authority." United States v. Prevatte, 66 F.3d 840, 847 (7th Cir. 1995) (Posner, C.J., concurring). To be sure, the Seventh Circuit explained, in reaching the conclusion that the pre-1994 version of section 34 prohibited the sentencing court from sentencing a defendant, in the absence of a jury recommendation, to a sentence exceeding his life expectancy:

> In our view, the pre-1994 version of § 34 indicated a Congressional intent to impose real limits on a district court's

15

otherwise broad sentencing discretion. The language of that statute did not permit the defendant to be "subject" to a life sentence unless the jury so decided. If we are to give the legislative decision real meaning, a sentencer cannot be permitted to evade the restrictions on one kind of sentence by imposing a substantially identical one with a slightly different name. We therefore hold that Martin's fifty year sentence, given in the knowledge that Martin would have to serve 42.5 years in prison and that that time span would extend beyond his life expectancy, was beyond the discretion of the district court.

Martin, 63 F.3d at 1434. Accordingly, the district court correctly concluded that it could not impose a sentence that exceeded Gullett's life expectancy.**10**

Gullett also contends that the district court was not at liberty to take into account good-time credits when imposing sentence. This argument is easily disposed of. Gullett essentially asks us to interpret the statute in a manner that would reward the defendant who says "I'm going to be a trouble-maker in prison." We decline to interpret the statute in that manner. See Prevatte, 66 F.3d at 848 (Posner, C.J., concurring) (maximum good time credits should be subtracted from a defendant's total sentence in determining whether sentence exceeded the statutory limits of section 34). Accordingly, the district court properly considered Gullett's good-time credits when imposing sentence.

In summary, the district court correctly applied the Sentencing Guidelines and did not exceed statutory limits when it sentenced Gullett to thirty-eight years' imprisonment.

_____

**10** We do not mean to imply that a sentence exceeding a defendant's life expectancy by a day, a week, or a month will constitute an abuse of discretion. "What is required is the judge's reasoned choice of a sentence that will fulfill the purposes of section 34." Prevatte, 66 F.3d at 849 (Posner, C.J., concurring).

V

Gullett also raises one other argument that he contends should be resolved in his favor. He contends that the district court erred in refusing to admit evidence that the injuries suffered by the victims were caused by a battery explosion. We have reviewed this assignment of error and find it to be without merit. Accordingly, for the reasons stated, the judgment of the district court is affirmed.**11**

AFFIRMED

_____

**11** From the factual circumstances in this case, and those in our recently decided opinion in United States v. Lowe, 65 F.3d 1137 (4th Cir. 1995), in the absence of prosecution by local and state authorities, one has to ponder whether the felonious killing of another is a criminal offense in Logan County, West Virginia.