**UNITED STATES of America**

v.

**Jack FERRANTI, Defendant.**

**No. 95–CR–119.**

United States District Court, E.D. New York.

June 5, 1996.

---

Zachary Carter, United States Attorney, by Lauren J. Resnick, Jennifer Boal, Brooklyn, New York, for United States.

Vivian Shevitz, Mount Kisco, NY, David M. Schuller, New York City, for Defendant.

*AMENDED MEMORANDUM
AND ORDER*

WEINSTEIN, Senior District Judge:

## TABLE OF CONTENTS

I. INTRODUCTION .................................................. 210
II. FACTS ......................................................... 210
III. SENTENCING PROCEEDINGS ........................................ 211
IV. MOTION TO DISMISS ARSON CHARGES ............................... 211
 A. Law ........................................................ 211
 B. Application of Law to Facts ................................ 212
V. MOTION TO DISMISS MAIL FRAUD CHARGES ......................... 213
VI. STATUTORY AND SENTENCING GUIDELINES REQUIREMENTS ....... 213
VII. PRISON ....................................................... 213
 A. Arson Resulting in Death ................................... 213
 B. Conspiracy to Commit Arson ................................ 216
 C. Mail Fraud ................................................ 216
 D. Tampering with a Witness .................................. 217
VIII. PECUNIARY PENALTIES GENERALLY ................................ 217
IX. FINES ........................................................ 219
X. COST OF PRISON ............................................... 220
XI. RESTITUTION .................................................. 220
 A. Law ........................................................ 220
 B. Application of Law to Facts ................................ 220
 (i) Direct Victims ........................................ 223
 (1) Michelle and Shelly Anthony ...................... 223
 (2) Estelle and William Cortes ....................... 223
 (3) Zbigniew and Jaowica Kwiatkowski ................. 223
 (4) Charles Wagner ................................... 223
 (5) Ronald Bass ..................................... 223
 (6) Thomas A. Ripley ................................ 224
 (ii) Indirect Victims .................................... 224
 (1) Cigna Fire Underwriters .......................... 224
 (2) New York Fire Department ......................... 224

 (iii) Total Payments...............................................224
XII. DISBURSEMENT OF FINES AND RESTITUTION ......................224
XIII. SPECIAL ASSESSMENTS...........................................224
XIV. SUPERVISED RELEASE ............................................224
XV. CONCLUSION....................................................225

## I. INTRODUCTION

For the reasons indicated below, defendant, who was found guilty of arson resulting in death and other crimes, must be sentenced to a term of just less than life imprisonment. Maximum monetary penalties, and restitution are also required.

## II. FACTS

Defendant owned and operated a retail women's clothing store on the ground floor of a three-story building in Maspeth, Queens. On the upper floors were four residential apartments.

The business was not profitable. Defendant had fallen behind on rent. Fire insurance premiums were not current. Notice of imminent cancellation of the policy had been given.

In the Fall of 1991, defendant began planning to set fire to the store in order to collect insurance proceeds and to avoid payment of future rent on what had become a burdensome lease. He paid the overdue premiums to ensure that his policy for fire damage would be in force. Months before the event he boasted of his plan to set the fire. He recruited a friend, Thomas Tocco, through his brother, Mario Ferranti, to help set the fire.

On February 24, 1992, at 5:00 p.m., an employee shut off the lights and locked the doors of the store, planning to return next morning. Later that same night someone possessing one of the two available keys entered. The bulk of the merchandise was removed. An old electric space heater was placed in the rear to make it appear that this was an accidental electrical fire. Flammable liquid was spread near the heater. At approximately 11:00 p.m. the fire was lighted by defendant or someone working under his direction.

The Fire Department arrived quickly. Fire and smoke were intense. Some of the building's eight residents had already fled in panic.

To ensure that no one was left in the building, two firefighters, Lieutenant Thomas A. Williams and Michael J. Milner, searched the front portion of the second floor. Visibility was nil. Heat was intense. Lieutenant Williams directed Milner to break open a floor-to-ceiling window to help ventilate the area. As Milner did so, he observed a passing shadow. It was Lieutenant Williams who fell to the pavement. Death was almost instantaneous.

Two dozen firefighters suffered minor injuries. Several tenants required treatment for smoke inhalation. Their possessions were destroyed. They were left homeless. Destruction of the building was close to complete. The fire also damaged adjoining premises.

The next day, fire marshals collected strong evidence of arson. Nine days after the fire, investigators located defendant. He claimed to know nothing about the fire, falsely stating that he had been visiting a girlfriend in New Jersey since the day prior to the fire. He lied about the financial difficulties his store was having. He lied when he asserted that the store was fully stocked with merchandise at the time of the fire.

Defendant accompanied investigators to the scene of the fire. When they entered the store, he walked directly towards the location where the heater had been placed; it had been removed earlier by investigators for testing. When questioned about the space heater, he falsely stated that it had been purchased a year or two before by one of his employees, and that it had been used intermittently in the store. In fact, the heater had not been purchased by an employee and was not brought to the store until the night of the fire.

Defendant lied when he told investigators that he did not know the address of the employee who closed the store on the night

of the fire. After the investigators left, defendant contacted this employee and convinced her to lie and say to the police that she had seen the space heater in the store the day of the fire. She agreed, at his request, to falsely report that she had not seen defendant the day of the fire when, in fact, she had observed him in his real estate office in Upper Manhattan. Defendant brought the employee to the police where she gave the false statements.

Defendant and his secretary contacted another person who had been at the store on the day of the fire. They asked her to convey false information to the police. She, however, resisted and stated truthfully to the authorities that she had never seen a space heater in the store.

Shortly after the fire, defendant mailed an insurance claim falsely asserting that $55,-250.32 in merchandise had been destroyed. On his claim application, which generated repeated correspondence through the mail, he essentially reiterated the false statements he had made to investigators. He repeated those lies once again in a deposition related to his insurance claim. Subsequently, defendant admitted to the insurance company's attorney that he had lied to the police about his whereabouts on the day of the fire. Defendant then withdrew his insurance claim.

During grand jury proceedings defendant pressured one of his employees to continue supplying false information to authorities. He retained an attorney to represent her at the grand jury proceeding and accompanied her to the attorney's office prior to her grand jury appearance. Contrary to defendant's expectations, her testimony implicated him.

A jury trial found defendant guilty on nineteen counts: conspiracy to commit arson, 18 U.S.C. § 371; arson resulting in death, 18 U.S.C. § 844(i); sixteen counts of mail fraud, 18 U.S.C. § 1341; and tampering with a witness, 18 U.S.C. § 1512(b)(1).

Defendant has a previous history of criminal convictions that include attempted possession of a weapon in the 3rd degree, and menacing. This prior conduct places defendant in criminal history category II under the Guidelines.

There are adverse allegations of defendant's conduct that have not led to conviction. They include being a "slumlord" who used violence against tenants and others. Defendant denies their truth. His close family ties with his parents, siblings, wife, ex-wife and son are urged on his behalf. None of these derogatory or supportive contentions need to be considered on this sentence. The crime itself provides overwhelming evidence of depravity.

## III. SENTENCING PROCEEDINGS

At sentencing the victims testified. The tenants remained deeply upset by terrifying memories of the event. Lt. Williams' daughter and wife were inconsolable.

Defendant made no personal statement on his own behalf. He moved for a new trial.

## IV. MOTION TO DISMISS ARSON CHARGES

### A. Law

Defendant contends that with respect to arson causing death, the government failed to prove the element "affecting interstate or foreign commerce." He also contends that the government did not provide sufficient evidence permitting prosecution in a federal court of what was essentially a state matter. *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

Title 18 U.S.C. § 844(i) provides that:

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property *used* in interstate or foreign commerce or *in any activity affecting interstate or foreign commerce shall* be imprisoned . . .

(emphasis supplied).

The Supreme Court in *Lopez* ruled that the criminal activity must "*substantially* affect interstate commerce in order to be within Congress' power to regulate it under the Commerce Clause." *Id.* at ——, 115 S.Ct. at 1630 (emphasis supplied). The offense must affect an activity that

arise[s] out of or [is] connected with a commercial transaction, which, viewed in the aggregate, substantially affects interstate commerce.

*Id.* at ——, 115 S.Ct. at 1631.

*Lopez* found an insufficient nexus between the federal government's regulation of interstate commerce and the location of guns near schools. That situation is far different from the traditional role the federal government has assumed in prosecuting arsons of establishments having an impact on interstate commerce. For example, in *Russell v. United States* the Supreme Court held that under the federal arson statute,

> the rental of real estate is unquestionably an activity [that affects interstate commerce].... [T]he local rental of an apartment unit is merely an element of a much broader commercial market in rental properties. The congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class.

471 U.S. 858, 862, 105 S.Ct. 2455, 2457, 85 L.Ed.2d 829 (1985). The *Russell* case involved a defendant who was renting his apartment building to tenants at the time he attempted to destroy it by fire. The property was held to have been used in an activity affecting interstate commerce within the meaning of section 844(i).

*United States v. Mennuti,* 639 F.2d 107 (2d Cir.1981), supports the conclusion that arson of the combined store and multiple apartment rental property in the instant case affected interstate commerce. *Mennuti* held that a single family private residence does not fall within the category of property involved in or affecting interstate commerce. It distinguished such residences from buildings that could be characterized as "business" property used for the sale of goods and services, *Id.* at 110, by implication approving application of section 844(i) to a retail store in a multiple apartment complex.

### B. Application of Law to Facts

■ The typical retail dress shop involved here is the end point of a complicated interstate and international web of garment production and sale. Cotton is supplied by southern states, California and Egypt. Wool comes from the Far West and the Antipodes. Decorations and buttons are sent from all over the world. Artificial fabrics are made in factories and chemical plants scattered around the country. Sewing is performed in New York, Los Angeles, Latin America and the western rim of the Pacific. Designs originate in Paris, New York and Japan. Copper for electric wiring is mined in Arizona, Canada and elsewhere. The metal for hangers, clothing racks and display cases is produced in other states and countries. Glass comes from factories here and abroad. Gas and oil for heating and electricity is shipped from the American South West and the oil producing nations of the Middle East. The fire insurance was financed in New Jersey. Credit sales were approved by American Express in Florida.

All these facts were known to the sophisticated jurors who live and work in or near New York City, one of the garment capitals of the world. Jurors need not park their experiences or knowledge of life outside the courthouse. *Castillo–Villagra v. I.N.S.,* 972 F.2d 1017, 1026 at fn. 1. (9th Cir.1992) (juries may rely on their common knowledge, observations and experience in the affairs of life in drawing inferences from evidence at trial); *United States v. Heath,* 970 F.2d 1397, 1402 (5th Cir.1992) (same), *cert. denied,* 507 U.S. 1004, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993); *United States v. Cruz–Valdez,* 773 F.2d 1541, 1546 (11th Cir.1985) (same) (en banc), *cert. denied,* 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986). A reasonable jury had sufficient basis to find that the store's and building's activities substantially affected interstate or foreign commerce. The commercial activity at the store, which was the object of defendant's scheme and offense, falls well within the interstate business category. *See Mennuti,* 639 F.2d at 110–111. This type of business establishes a sufficient nexus to satisfy the *Lopez* standard for federal intervention.

In addition to the commercial retail store space, the building fell within the class of multiple dwelling apartment buildings that is inherently a part "of a much broader com-

mercial market in rental properties" affecting interstate commerce within the meaning of 18 U.S.C. § 844(i). *Russell,* 471 U.S. at 862, 105 S.Ct. at 2457.

Defendant sought to defraud in connection with a New Jersey financed insurance policy. He affected interstate commerce by setting fire to a rental unit that served interstate commercial and residential purposes. His garment shop was connected to the world. The motion based on lack of proof of interstate or foreign commerce must be denied.

## V. MOTION TO DISMISS MAIL FRAUD CHARGES

■ Defendant moves to dismiss 15 of the 16 counts of mail fraud as duplicative. Each represented a separate mailing as part of the arson scheme. No separate fines or other punishments are imposed with respect to the mail fraud charges. Only the special assessment is affected by the separate mail fraud counts. Concurrent sentences are imposed on all counts. The evidence supports each mail fraud count.

## VI. STATUTORY AND SENTENCING GUIDELINES REQUIREMENTS

Section 3553 of Title 18 of the United States Code describes the factors the court must consider at sentencing. The statute directs the court to "impose a sentence sufficient, but not greater than necessary, to comply with purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). It comprehensively states that the court

shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant [and]

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the 'public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional

treatment in the most effective manner;

*Id.* *See United States v. Guiro,* 887 F.Supp. 66 (E.D.N.Y.1995) (sentencing options available for defendants must be compatible with the statutory directives); *United States v. Abbadessa,* 848 F.Supp. 369, 378–79 (E.D.N.Y.1994) (statute requires that the most appropriate sentence be imposed taking into account a defendant's special circumstances), vacated, remanded sub nom., *United States v. DeRiggi,* 45 F.3d 713 (2d Cir. 1995); *United States v. Concepcion,* 795 F.Supp. 1262, 1271 (E.D.N.Y.1992) (the Sentencing Guidelines do not alleviate the court's sentencing burden with respect to the statutory directives under 18 U.S.C. § 3553(a)), disapproved on other grounds, *United States v. DeRiggi,* 45 F.3d 713 (2d Cir.1995). Other factors the court considers in sentencing include the kinds and ranges of sentences found in the applicable Sentencing Guidelines, policy statements of the Sentencing Commission, the need to avoid sentencing disparity and the need to provide restitution to victims. 28 U.S.C. § 3553(a)(2), (4)–(7).

## VII. PRISON

### A. Arson Resulting in Death

Sentencing for arson is controlled by Sentencing Guidelines § 2K1.4. Because death resulted, § 2K1.4(c)(1) directs utilization of the "most analogous guideline" from the homicide section of part A relating to chapter two—offenses against the person. Guidelines § 2A1.1 provides for life imprisonment for murder in the first degree.

■ Per 18 U.S.C. § 1111(a), murder in the first degree includes death caused by arson. First degree murder under Guidelines § 2A1.1 with a base offense level of 43 is the crime most analogous to the charged offense, arson causing death. *United States v. Prevatte,* 66 F.3d 840, 842–844 (7th Cir. 1995); *United States v. Martin,* 63 F.3d 1422, 1433 (7th Cir.1995) (death of a firefighter requires application of Guidelines § 2A1.1); *United States v. Ryan,* 9 F.3d 660, 672 (8th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995); *United States v. El–Zoubi,* 993 F.2d 442, 450–51 (5th Cir.1993).

Section 1111(a) of the United States Statutes, covering murder in the first degree, incorporates essentially the common law definition which includes the phrase "killing" "in the perpetuation of" "any arson as first degree murder." The section provides:

Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing, or *committed in the perpetration* of, or attempt to perpetrate, *any arson*, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

(Emphasis supplied.)

 Murder in the first degree would normally be punishable by imprisonment for life or death. 18 U.S.C. § 1111(b). The Guidelines commentary under first degree murder permits a discretionary downward departure based on reduced culpability. U.S.S.G. § 2A1.1 cmt. No. 1. It reads:

The Commission has concluded that in the absence of capital punishment life imprisonment is the appropriate punishment for premeditated killing. However, the guideline also applies when death results from the commission of certain felonies ...

If the defendant did not cause the death intentionally or knowingly, *a downward departure may be warranted.* The extent of the departure should be based upon the defendant's state of mind (*e.g.* recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct.

(Emphasis supplied.) Neither the circumstances of the particular crime nor the history of punishment for arsons of this type supports a downward departure.

Arson resulting in loss of human life is murder at common law under the felony murder rule and is first degree murder under most of the statutes which divide the crime into degrees. Rollin M. Perkins, *Perkins on Criminal Law*, 44 (2d ed. 1969).

The New York state statute, while not directly applicable, provides a useful indication of how this crime would be treated in the United States. It would be characterized as arson in the first degree under New York Penal Law § 150.20(1). That provision reads

A person is guilty of arson in the first degree when he intentionally damages a building ... by causing ... a fire and when (a) such ... fire ... either (i) causes serious physical injury to another person other than a participant, or (ii) the ... fire was caused with the expectation or receipt of financial advantage or pecuniary profit by the actor; and when (b) another person who is not a participant in the crime is present in such building ... at the time; and (c) the defendant knows that fact or the circumstances are such as to render the presence of such person therein a reasonable possibility.

The crime falls within each subparagraph of section 150.20(1). The fire "caused serious physical injury to a person other than a participant." The fire was "caused with the expectation ... of financial advantage." "[A]nother person who [was] not a participant ... [was] present in the building." "[T]he circumstances [were] such that as to render the presence of such person therein a reasonable probability." Arson in the first degree is a class A–1 felony in New York requiring an indeterminate term with a minimum of 15 to 25 years and a maximum of life.

Arson of an occupied house is "punished severely because, in burning a dwelling, the defendant manifests a contempt for human life;" the crime was a capital offense. 3 *Wharton's Criminal Law* 325 (1995). While the fire was set in a store, it was directly under two stories of apartments occupied by four families. The staircase to the apartments was next to the store and the defendant must have known the apartments were occupied, especially in light of his own experience as an owner of tenant occupied real estate. The fire was knowingly set at night, when defendant was well aware that tenants would have been asleep or preparing to retire. One of the conspirators at the scene of the crime even asked one of the fleeing ten-

ants if everyone was out of the building—though he hurried away before obtaining an answer.

Here the facts support a finding of depraved indifference to death of the victim. The arson was particularly malicious. Only through good fortune were the casualties limited to one death. Even though defendant may not have specifically intended to kill a tenant or a firefighter, he is not relieved of responsibility for the inherently dangerous nature of the crime. *See United States v. Martinez,* 16 F.3d 202, 208 (7th Cir.) ("felony murder is often found in situations of accidental death"), *cert. denied,* —— U.S. ——, 114 S.Ct. 2150, 128 L.Ed.2d 877, *cert. denied,* —— U.S. ——, 115 S.Ct. 226, 130 L.Ed.2d 152 (1994).

The aggravating elements present in the instant case that would warrant the highest condemnation under a wide variety of statutes include: the building being a habitable structure; a person being present at the time of the burning; a person being injured; the defendant having had reason to believe that a person was present at the time of the burning; a firefighter being subject to substantial risk of bodily injury; the offense occurring at night; an accelerant being used; and scheming to defraud an insurance carrier. *See, e.g.,* II *American Law Institute Model Penal Code and Commentaries* 3, 10, 11 (1980).

■ Despite the strong support for a life sentence, in this specific case a sentence of less than life in prison is required. Defendant committed the offense in 1992. At that time a jury directive was required for a life sentence. 18 U.S.C. § 34. It was not until 1994 that the need for a jury directive as a predicate for a life sentence was eliminated. Pub.L. 103–322 § 60003(a)(1), 1994 U.S.C.C.A.N. 1801.

The *ex post facto* doctrine applies. It prohibits application of the 1994 amendment eliminating the need for jury approval of a life sentence for arson causing death. *See Collins v. Youngblood,* 497 U.S. 37, 43, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990) (*ex post facto* doctrine prohibits the retroactive application of laws that make more burdensome the punishment for a crime after its commission).

The applicable Guideline base offense level of 43 requires a life sentence. U.S.S.G. Sentencing Table (1995). In order to comply with the *ex post facto* doctrine and impose a sentence less than life a downward departure to a base offense level of 42 is mandated. This category provides for a term of imprisonment between 360 months (30 years) and life, regardless of the defendant's criminal history category.

Even if second degree murder were relied upon as the applicable analogous provision with a lesser base offense level of 33, a nine point increase would be imposed as a matter of discretion because of the aggravating factors. The defendant had long planned the arson. He had discussed it months before with at least one witness. He committed the arson for a financial advantage of some $50,000 in a possible insurance recovery and the breaking of an unprofitable lease. In view of his extensive wealth, the avarice that put so many people at risk must be condemned by imposing the most severe punishment. *See United States v. Menzer,* 817 F.Supp. 64, 66 (E.D.Wis.1993) (second degree murder occurs where life is lost due to eminently dangerous and reckless conduct evincing a depraved mind), *aff'd,* 29 F.3d 1223, *cert. denied,* —— U.S. ——, 115 S.Ct. 515, 130 L.Ed.2d 422 (1994). In light of all the evidence, defendant's contention that he should be treated as if he were guilty of murder in the second degree, with a base offense level of 33 at a criminal history category of II and no upward departure, leading to a range of 151–188 months is not acceptable.

The conflicting evidence about whether defendant was a loving family person, loyal to his employees, or a vicious hounder of tenants, are beside the point. Defendant is not being punished to deter or incapacitate him. He must be punished for general deterrence.

Arsons in New York City are particularly dangerous. They represent one of the greatest hazards to the well being of those who reside, work, or visit here. In the last decade almost 400 civilian deaths were attributed to arson in this city. In 1985, there were 26 deaths; in 1986, 22; in 1987, 25; in 1988, 35; in 1989, 43; in 1990, 126; in 1991, 33; in 1992, 23; in 1993, 27; and in 1994, 28.

Bureau of Fire Investigation, *The New York Fire Department Annual Report,* April 22, 1996. Six firefighters have lost their lives because of arson in the last decade. *Id.*

The term imposed consonant to the *ex post facto* doctrine cannot equal or exceed defendant's life expectancy. A sentence lasting beyond defendant's expected lifetime would circumvent the jury directive requirement of 18 U.S.C. § 34 in effect when the crime was committed. *United States v. Gullett,* 75 F.3d 941, 951 (4th Cir.1996). Here the government did not ask for such a jury verdict.

■ The life expectancy of the defendant must be determined in order to avoid a life sentence in fact. *Prevatte,* 66 F.3d at 844; *Gullett,* 75 F.3d at 951. The defendant is 43 years old. His life expectancy is 31.0 years. *See Statistical Bulletin—Metropolitan Life Insurance Company,* 1995 WL 8300351 (July 18, 1995).

Defendant will receive 54 days of good-time credit for each year of his prison sentence. 18 U.S.C. § 3624(b). This credit is properly considered in determining whether defendant will probably complete his sentence before he dies. *Gullett,* 75 F.3d at 951. Defendant may thus be sentenced to 435 months, taking into account his 31.0 years life expectancy and a cumulative deduction of 5.36 years for good-time credit. If the good-time credit is considered, defendant will serve a sentence of 371 months measured from the time of his arrest, somewhat less than his 372 month life expectancy from the date of sentencing. The following table indicates the required sentence computation.

### TABLE A

| Terms of Computation | Months | Years |
| --- | --- | --- |
| Sentence at Criminal History II, level 42 (U.S.S.G.) | 435 | 36.25 |
| Good time credit 54 days per year | 64.2 | 5.35 |
| Defendant's life expectancy at 43 years of age | 372 | 31 |
| Sentence less good time credit | 371 | 30.9 |
| Time served up to date of sentencing | 14.4 | 1.2 |
| Sentence less good time credit and time served up to date of sentencing | 357 | 29.7 |
| Release before end of life expectancy | 15 | 1.3 |

This sentence would not constitute abuse of discretion or a violation of the *ex post facto* doctrine. *Gullett,* 75 F.3d at 951 n. 10. A sentence close to a person's life expectancy may be imposed since it remains less severe than a life sentence. *Prevatte,* 66 F.3d at 847–848.

In light of the seriousness of the offense, which resulted in the death of a firefighter killed in the line of duty, the endangerment of the lives of the other firefighters as well as the lives of the tenants whose residences were located in the building, and other aggravating factors, defendant is sentenced to 435 months imprisonment at a base offense level of 42.

### B. Conspiracy to Commit Arson

■ With respect to count one, 18 U.S.C. § 371, conspiracy to commit arson, the Guideline, § 2X1.1(a), leads to the same level as that for arson resulting in death. Since the maximum penalty under 18 U.S.C. § 371 is five years, far less than the Guideline range, a five year sentence is appropriate.

### C. Mail Fraud

■ The applicable Guideline for the defendant's offense level under 18 U.S.C. § 1341 is provided by § 2F1.1(a). It sets a base offense level of 6. Under § 2F1.1(b)(1)(F) the level may be increased by five as a result of defendant's attempt to defraud an insurance company of over $50,-000.00. Where the mail fraud offense involved a conscious risk of serious bodily injury, the offense level may be further increased by two. U.S.S.G. § 2F1.1(b)(4). Pursuant to Guidelines § 2F1.1(b)(2) the offense level is increased by two where the offense involved more than minimal planning. An increase of two more points is warranted where the defendant was the organizer, leader or manager of the conspiracy and exercised control over others. U.S.S.G. § 3B1.1(c). A further two point upward adjustment is warranted where the defendant "impedes the administration of justice during the investigation, prosecuting, or sentencing of the instant of-

fense." U.S.S.G. § 3C1.1. Defendant's own lies, apart from the tampering with a witness offense, impeded the administration of justice. These adjustment factors would bring defendant's total level for each count of mail fraud to 19 points. This leads to a 41 months maximum Guidelines term for the defendant with a category II criminal history.

■ An upward departure from 41 months to 60 months is required based on factors not considered in the Guidelines adjustments. Serious injury and death were likely to and did occur as a result of the scheme. The other aggravating factors already referred to in connection with the discussion of arson resulting in death supports an upward adjustment to the maximum sentence of five years imprisonment. The sentence on each of the mail fraud counts must be served concurrently with the other terms of imprisonment imposed.

### D. Tampering with a Witness

The applicable Guidelines section for the defendant's conviction under 18 U.S.C. § 1512(b)(1) for tampering with a witness is § 2J1.2(c)(1). The required cross reference to § 2X3.1 provides for an offense level based on the underlying offense up to a level 30. Since the underlying offense provides a base level of 42, the applicable capped base offense level is 30. An offense level of 30 with a criminal history category II provides for a range of 108 to 135 months of imprisonment. The statute provides for a maximum of ten years imprisonment which would be one year and three months less than the maximum under the Guidelines. 18 U.S.C. § 1512(b)(1).

■ Defendant is subject to the maximum imprisonment term for tampering with a witness and obstruction of justice. He induced his employee to provide false information to police and attempted to have her testify falsely to a grand jury. Such manipulation and defiance of the criminal justice system represents a threat that must be seriously penalized. Defendant is sentenced to ten years imprisonment on this count to be served concurrently.

## VIII. PECUNIARY PENALTIES GENERALLY

■ As indicated in Parts IX. Fines, X. Cost of Prison, XI. Restitution, and XIII. Special Assessment, *infra*, the required pecuniary penalties are severe. The total money payment mandated is more than three times the pecuniary harm caused by defendant's crimes. Historically, restitution has often been greater in proportion to harm caused. *See* Part XI. A., *infra*. Given this history, the need for general deterrence of this greed driven crime, and the dangers it poses in our urban society, the financial penalty imposed can not be deemed unconstitutionally cruel and unusual punishment. *See Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Eighth Amendment does not require strict proportionality between crime and sentence, but rather forbids only extreme sentences that are grossly disproportionate to the crime); *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382 (1980) ("[o]utside context of capital punishment, successful challenges to proportionality of sentences have been rare").

When applicable, pecuniary penalties serve more than punishment purposes; they provide tort-like remedies to institutions, communities, and victims who suffer the consequences of criminal conduct. Such quasi-remedial measures fall well within constitutional due process requirements. The analogous but more developed procedure used by the respected French criminal-civil system demonstrates that restitution as an added feature of criminal law is not inconsistent with due process. The private restitutory portion of the penalty reflects an important change in the direction of our criminal law to amalgamate tort-like functions with criminal prosecutions.

The archaic necessity of self-help to punish and compensate tended to create feuds and tensions inconsistent with a peaceful centrally controlled society. An important step in limiting private vengeance was the eye-for-an-eye and tooth-for-a-tooth edict of the bible and like limits in other early codes.

Later, tort law based on negligence rather than accident without fault, constituted another step forward in controlling private re-

tributory conduct. Strict liability in limited contexts to provide both deterrence and compensation constitutes a still developing further advance. *See generally, e.g.,* Oliver Wendell Holmes, Jr., *The Common Law,* (1881); David Rosenberg, *The Hidden Holmes, His Theory of Torts in History* (1995); *Restatement (Third) of Torts: Products Liability* (Tentative Drafts Nos. 1, 2, 3, 1994, 1995, 1996).

Post-medieval parallel and almost simultaneous growth of private tort law and public criminal law separated the individual interest in compensation from the social interest in punishment and deterrence. There were overlaps, of course. Tort law served a public purpose of deterrence and, like the criminal law, provided a sense of justice mollifying the urge for self help and revenge. Criminal law does sometimes deter and compensate the state through fines for some of the costs of prosecution and harm to the state. *See, e.g.* 26 U.S.C. §§ 7201 (tax evasion), 7203 (costs of prosecution); *see also United States v. Terrell,* 390 F.Supp. 371 (1975) (defendant received substantial income upon which substantial taxes were due, and his failure to file returns was deliberate). Private attorney general prosecutions through class actions, whistle blower suits, qui tam actions, fines and compensations by administrative agencies and other quasi-private and quasi-public procedures are developing. They have begun to blur our sharp civil-criminal-administrative law distinctions. *Cf. Georgine v. AmCHEM Products, Inc. et al.,* 83 F.3d 610, 632–33 (3d Cir.1996) (Becker, J.).

Unlike the still fairly clear line between civil and criminal remedies in Anglo–American law, the French system has long utilized criminal prosecutions to provide for victim compensation. In France, as in most Romanistic legal systems, the victim plays an important part in the criminal proceeding. The principle of discretionary criminal prosecution applies in France with respect to the public prosecutor's office. The French Code of Criminal Procedure Art. 40 ¶ 1 (Gerald L. Kock & Richard S. Frase trans. rev. ed. 1988) [hereinafter French Code of Criminal Procedure]. The victim can, by means of the *action civile* raise an official complaint even

if that is contrary to the wishes of the public prosecutor. French Code of Criminal Procedure Art. 1 ¶ 2. The *action civile* does two things: it initiates a claim for compensation, and it begins a public criminal action. Martine Merigeau, *Evaluation of the Practice of Compensation within Recent Victim-related Crime Policy in France* in Victims and Criminal Justice 240–241 (Gunther Kaiser, Helmut Kury, Hans–Jorg Albrecht ed. 1991).

The French victim's right to initiate public criminal action provides an important check on prosecutorial discretion. Moreover, the right to demand civil damages in the criminal court allows a broader scope for the French court to assess the extent of compensation for damages than does the American counterpart of restitution. The victim can insist that the examining magistrate investigate and help document the civil claim. The court must rule on the civil claim; damages awards are enforceable both as a condition of probation and as a civil judgement. *See* Richard S. Frase, *Comparative Criminal Justice as a Guide to American Law Reform: How Do the French Do It, How Can We Find Out, and Why Should We Care?,* 78 Cal.L.Rev. 542, 670–71 (1990); *see also, e.g.,* Ruth Bader Ginsburg & Anders Bruzelius, *Civil Procedure in Sweden,* 145–150 (1965) (court in which criminal prosecution is instituted has ancillary competence to adjudicate related civil claims).

Under Article 3 of the French Code of Criminal Procedure the civil action may be pursued at the same time and before the same court as the prosecution. This civil claim may include "all heads of damages, material as well as bodily or moral, which flow from the acts that are the object of the prosecution." French Code of Criminal Procedure Art. 3 ¶ 2; *see also* Stephen Schafer, Compensation and Restitution to Victims of Crime, 21 (2d ed. 1970).

A French victim has the choice of bringing the civil action in civil or criminal court. If brought in the criminal court, the *action civile* is subject to the statute of limitations applied to the specific crime. In all other respects this civil action conforms to the French Rules of Civil Procedure. For example, although the conviction part of a felony

trial is heard by a jury; the court dismisses the jury before hearing the parties with respect to the civil damages claims made by the victim against the accused or by an acquitted accused against the victim. French Code of Criminal Procedure Art. 371 ¶ 1. The victim retains the right to enforce the claim for restitution against the prisoner's earnings while he is incarcerated. Schafer, *supra*, at 23.

The United States is in a state of transition on restitution. How far it will move toward an integrated criminal-civil-administrative system in areas such as mass torts or environmental delicts, what effect recovery for restitution will have on the tort law system's collateral benefits rule, how much cooperation there will be between the public prosecutor, administrative agencies and private persons, and many other issues are just beginning to be addressed. *See generally* ABA Standards for Criminal Justice, Sentencing, 107–112 (1994) (new section on restitution). The discussion that follows in Parts IX—XIII, *infra*, has made as few assumptions about new developments as possible, utilizing traditional criminal law conceptions in-so-far as the new statutes permit.

IX. FINES

In addition to the required sentencing considerations under 18 U.S.C. § 3553, the following factors set out under 18 U.S.C. § 3572(a) must be considered when imposing a fine: the defendant's income, earning capacity, and financial resources; the burden that the fine will impose upon the defendant, any person who is financially dependant on the defendant, or any other person that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose; any pecuniary loss inflicted upon others as a result of the offense; whether restitution is ordered or made and the amount of such restitution; the need to deprive the defendant of illegally obtained gains from the offense; the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence; and whether the defendant can pass on to consumers or other

persons the expense of the fine. *Compare United States v. Marquez,* 941 F.2d 60, 65–66 (2d Cir.1991) (district courts must consider the defendant's ability to pay a fine, but specific findings are not needed) *with United States v. Demes,* 941 F.2d 220, 224 (3d Cir.) (court must consider ability to pay and "make an explicit finding" on ability to pay), *cert. denied,* 502 U.S. 949, 112 S.Ct. 399, 116 L.Ed.2d 348 (1991).

The government has the burden of showing a valid basis for the fine or for restitution. *Cf.* 18 U.S.C. § 3664(d) (restitution based on loss). The defendant than bears the burden of establishing inability to pay. *Id.;* Mary C. MacIsaac, *Restitution,* 83 Geo. L.J. 1318 (1995).

An upward departure to a higher fine amount from the statutory maximum range is warranted under 18 U.S.C. § 3571(d). Where the offense "results in a pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of … twice the gross loss, unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process." 18 U.S.C. § 3571(d). *Cf., Gaind v. United States,* 871 F.Supp. 186, 188 (S.D.N.Y.) (where financial gain is the motive for a crime with substantial adverse effects on the public, reallocating loss to wrongdoer through financial sanction is vital to the purpose of sentencing).

Guidelines § 5E1.2 comment n. 4 indicates that

the Commission envisioned that for most defendants, the maximum of the guideline fine ranges [under] [§ 5E1.2](c) will be at least twice the amount of gain or loss resulting from the offense. Where, however, two times either the amount of gain to the defendant or the amount of loss caused by the offense exceeds the maximum of the fine guideline, an upward departure from the fine guideline may be warranted.

Based on public financial records and earlier statements made by the defendant to pretrial services, the presentence investigation report estimates that defendant has an admitted net worth of $4,389,503. He retains, according to his own calculation, real property holdings worth a total of $5,578,000.

■ Defendant more likely than not possesses much more in assets than he admits. He did not file any income tax returns for the past ten years. Under the circumstances, lack of cooperation with probation in revealing his assets leads to the conclusion that substantial additional assets are likely to have been deliberately hidden. *United States v. Sessa,* 821 F.Supp. 870, 875 (E.D.N.Y.1993) (estimate of defendants' assets was based on significant amount of money involved in their criminal extortion activities), *aff'd,* 41 F.3d 1501 (2d Cir.1995).

■ Defendant has the capacity to pay the required restitution along with payment of a fine for count two, arson resulting in death, that is based on an appropriate upward departure. After payment of the fine and restitution, defendant should still retain significant assets. Enough should remain to provide child support for his nine year old son and former wife.

Defendant's immediate family is financially independent. His present wife owns her own home and does not depend on defendant for income or financial support. His parents and siblings also maintain their financial independence.

Departure to a fine that equals double the amount of restitution ordered under count two, arson resulting in death, is appropriate in this case, given the degree of damage defendant has caused the community. *See* U.S.S.G. § 5E1.2 cmt. n. 4. This was essentially a crime based on greed. General deterrence through heavy financial penalties is necessary.

The upward departure to double the amount of pecuniary loss caused to the victims reflected in the restitution described in Part XI, *infra,* is appropriate. This amounts to a fine of $2,911,599.58. The total fine is less than the maximum of $250,000 on each of nineteen counts—$9,750,000 if cumulative. U.S.S.G. § 5E1.2(c)(3).

## X. COST OF PRISON

Imposing costs for imprisonment, probation, or supervised release is appropriate, given the defendant's ability to pay. U.S.S.G. § 5E1.2(i). The cost of imprisonment may be imposed after a punitive fine. U.S.S.G. § 5E1.2(i). This cost is considered separately from the Sentencing Guidelines' fine table. U.S.S.G. § 5E1.2(c); *United States v. Leonard,* 37 F.3d 32, 40–41 (2d Cir.1994) (imposition of an imprisonment fine is not an upward departure from U.S.S.G. § 5E1.2(c)); *Sessa,* 821 F.Supp. at 875 (cumulative fines as well as cost of imprisonment may be imposed).

■ According to calculations based on the defendant's expected time in prison of approximately 370 months (*see* Part VII A, *supra* ), and taking into account a present interest rate of 5.46%, defendant must pay $318,037.57 to cover the probable costs of his confinement. This figure is based on a monthly cost of confinement of $1,779.33 estimated by the Administrative Office of the United States Courts. Payment for time already served shall be collected. In the light of probable inflation, monthly costs are conservative, favoring defendant. Should the defendant have insufficient assets to pay for support of his first wife and son, part of the monthly payment will be used for purposes of support. The method is described in Part XV, *infra.*

## XI. RESTITUTION

### A. Law

■ Restitution is an "[a]ct of restoring; restoration of anything to its rightful owner; the act of making good or giving equivalent for any loss, damage or injury; and indemnification." Black's Law Dictionary, 1477 (4th ed. 1968). Statutory-based restitution is a payment to victims of crime by an offender to cover losses incurred as a result of the crime. The payment can take the form of either money or services to the victim or the state. *See generally* Elmar Weitekamp, *Recent Developments on Restitution and Victim–Offender Reconciliation in the U.S.A. and Canada: An Assessment,* in Victims and Criminal Justice 425 (Gunther Kaiser, Helmut Kury, Hans–Jorg Albrecht ed. 1991).

Payment for wrongs committed in the form of restitution to victims has a long history. It has always been closely intertwined with conceptions of punishment and

justice. The law of Moses required fourfold restitution for stolen sheep and fivefold for the more useful ox; the Middle–Eastern law Code of Hammurabi (c. 1700 B.C.), which focused on implementing deterrent measures through severe and cruel punishments and imposition of restitution for property offenses, could demand up to thirty times the value of damage caused. *See generally* Charles F. Abel and Frank H. Marsh, *Punishment and Restitution, A Restitutionary Approach to Crime and the Criminal,* 25–30 (1984); Tamar Frankel, Symposium, The Intersection of Tort and Criminal Law, *Lessons from The Past: Revenge Yesterday and Today,* 76 B.U. L.Rev. 157, 158 (1996) (focus on Medieval revenge aspects of punishment and restitution); Stephen Schafer, *Compensation and Restitution to Victims of Crime,* 4 (1970); Daniel W. Van Ness, *Restorative Justice,* in Criminal Justice, Restitution, and Reconciliation 7–14 (Burt Galaway and Joe Hudson ed. 1990).

The Roman Law of the Twelve Tables (449 B.C.) required thieves to make restitution payments to their victims starting at double the value of the stolen goods. The value of the payment due would increase depending on the circumstance in which such stolen goods were found or confiscated. *See* Van Ness at 7. In England, prior to the Middle Ages, elaborate and detailed systems of victim compensation were developed by the Anglo–Saxons, placing the victim's right to compensation at the forefront of punishment considerations. *Id.*

Views on criminality and punishment shifted in England beginning with the reign of William the Conqueror and the growth of central government administration. The King or State began to take center stage and was treated as the paramount "victim" of offenses, to whom offenders had to make payment. Offenses were thought of as crimes against society, rather than against the individual. *See generally* Roger Meiners, *Victim Compensation* (1978). Until recently this was the approach in the United States.

In this country victim restitution has recently emerged in the criminal justice system, initially through legislation passed by individual states, as either an alternative to incarceration or as an added component of the sentence. *Id.,* 25–39. At the federal level, the Victim and Witness Protection Act of 1982 emphasized victims' interest in the sentencing stage. Pub.L. 97–291, 1982 U.S.C.C.A.N. 2515–2516. These interests include the right to be heard at sentencing, *Id.* at 2517–2520, and the right to restitution. *Id.* at 2519–2520; 18 U.S.C. § 3663.

The enactment of these modern statutes has increased the obligation of courts to consider the victims' need for emotional healing and financial compensation within the context of criminal law. Their special interests are evaluated separately from those of the government. The legislative history of the Victim and Witness Protection Act emphasized the need for "legislative action to assist victims ... [to correct] the insensitivity and lack of concern for the witness" that has marked the structure of our criminal justice system. Pub.L. 97–291, 1982 U.S.C.C.A.N. 2515–2516. The objective is to try to make the victims as whole as possible—both financially and psychologically.

Under the Victim and Witness Protection Act restitution may be ordered. 18 U.S.C. §§ 3663–3664. Section 3663(a)(1), reads as follows:

> The court ... may order, in addition to or in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense.

Section 3663 allows exercise of a broad discretion in providing restitution. The following types of payment are authorized:

> (b)(1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense—
>
> (B) if return of the property ... is impossible, impractical, or inadequate, pay an amount equal to or greater of—
>
> > (i) the value of the property on the date of the damage, loss, or destruction, or
> >
> > (ii) the value of the property on the date of sentencing, less the value of any part of the property that is returned;
>
> (2) in the case of an offense resulting in bodily injury to a victim—

(A) pay an amount equal to the cost of necessary medical and related professional services . . .

(C) reimburse the victim for income lost by such victim as a result of such offense;

(3) in the case of an offense resulting in bodily injury also results in the death of a victim, pay an amount equal to the cost of necessary funeral and related services; . . .

Extra compensation for already compensated loss is not permitted, but someone who compensated the victim may be paid the amount advanced. Section 3663(e)(1) provides that:

The court shall not impose restitution with respect to a loss for which the victim has received or is to receive compensation, except that the court may, in the interest of justice, order restitution to any person who has compensated the victim for such loss to the extent such person paid the compensation.

■ Payment is limited to the "loss caused by the specific conduct that is the basis of the offense of the conviction." *Hughey v. United States*, 495 U.S. 411, 413, 110 S.Ct. 1979, 1981, 109 L.Ed.2d 408 (1990). *Hughey* held that "the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order . . . [and] [is] intended to guide a court's discretion." *Id.* at 420, 110 S.Ct. at 1984. The Supreme Court noted that,

the detailed substantive guidance regarding calculation of restitution that is found in subsections (b)(1), (b)(2), (b)(3) makes clear that § 3579 does more than simply designate *who* is entitled to restitution under the Act; those provisions establish the *amount* of restitution that courts can award for various losses caused by the offense.

*Id.* at 417–18, 110 S.Ct. at 1983 (emphasis in original).

■ *United States v. Husky*, 924 F.2d 223, 226–227 (11th Cir.), *cert. denied*, 502 U.S. 833, 112 S.Ct. 111, 116 L.Ed.2d 81 (1991), interpreted the list of compensable expenses in the restitution statute as "exclu-sive." It does not include compensation to victims for "mental anguish and suffering." *Id.* Compensation for pain and suffering and other injuries not covered by the restitution award may be obtained in an independent civil action for excluded damages based on the same incident. *Id.* at 226 (restitution for mental anguish and suffering is improper).

There is some uncertainty among courts as to who the precise beneficiaries should be and what calculations should be used to determine loss for restitution purposes. *See United States v. Gibbens*, 25 F.3d 28, 32–33 (1st Cir.1994) (government at any level may be a victim); Mary C. MacIsaac, *Restitution*, 83 Geo.L.J. 1318, 1320–21 (1995) (various calculations exist to measure actual loss). This issue need not be plumbed since defendant has stipulated to the restitution amounts due to each claimant. The court approved the stipulation after a full hearing in which the losses agreed to were proven.

Before restitution is imposed, the Victim and Witness Protection Act requires that the court take into account, in addition to "the amount of the loss sustained by any victim as a result of the offense, the [defendant's] financial resources and ability to pay, the financial needs and earning ability of the defendant and [his] dependents, and such factors as the court deems appropriate." 18 U.S.C. § 3664(a).

■ Although the court is not required to set forth detailed findings as to every factor, " 'the record must demonstrate that the court has considered these factors in ordering restitution.' " *United States v. Soto*, 47 F.3d 546, 550 (2d Cir.1995) (citation omitted); *see also United States v. Roy William Harris*, 79 F.3d 223 (2d Cir.1996) (court must consider the financial needs of defendant and his dependents before ordering payment of restitution); *United States v. Tortora*, 994 F.2d 79, 81 (2d Cir.1993) (record must reflect that statutory factors were considered in ordering restitution).

In order to ensure that the victims are fully compensated for their losses the court may impose pre- and post-judgement interest. 28 U.S.C. § 1961(b); *United States v. Simpson*, 8 F.3d 546, 552 (7th Cir.1993);

*United States v. Smith,* 944 F.2d 618, 626 (9th Cir.1991), *cert. denied,* 503 U.S. 951, 112 S.Ct. 1515, 117 L.Ed.2d 651 (1992) (same); *United States v. Rochester,* 898 F.2d 971, 983 (5th Cir.1990) (interest permitted even though not mentioned in statute). The interest rate on criminal restitution is collected in the manner provided for fines. 18 U.S.C. § 3663(h)(1)(A). The government is statutorily entitled to collect interest—if it is allowed by the court—at the rate applicable to debts owed to the United States. 31 U.S.C. § 3717(a)(g)(2). In this case interest is not to be collected for the reason set out in Part XI. B., *infra.*

### B. Application of Law to Facts

██ Restitution is called for because of the nature of the crime committed by defendant, the damage his acts caused, and the extent of the assets he possesses. The arson caused injury and death as well as extensive physical and economic damage to the building, tenants and firefighters. It put a large number of lives at risk. Defendant has shown contempt for our justice system, as demonstrated by his attempts at manipulating and intimidating key witnesses and his lies to investigators.

Defendant has failed to provide information about his assets through pre-sentencing discovery proceedings. He has not contested his ability to pay restitution or fines claimed by the government. He has the ability to pay all the restitution due under the statute as well as the fine imposed and cost of incarceration. Since much of defendant's assets are in the form of real estate holdings and some appear to be jointly owned, liquidation will be necessary to comply with the restitution and fine order.

No post or pre-judgement interest needs to be added. The penalties imposed suffice. Interest is not required since the government can collect the sums due promptly and the need to support his former wife and his child as well as restitution and fines will leave almost nothing with which to pay interest.

Restitution amounts that have been stipulated to by the government and defendant are as follows.

#### (i) Direct Victims

##### (1) Michelle and Shelly Anthony

The Anthonys lived in the second floor apartment directly above the store. The fire destroyed all of their personal property. They had no insurance. The actual loss incurred amounts to $56,569.40.

##### (2) Estelle and William Cortes

The Corteses lived in a third-floor apartment. They lost all of their possessions. Their losses, after subtracting the $3,000.00 deduction they received in their 1992 taxes, total $18,506.00.

##### (3) Zbigniew and Jaowica Kwiatkowski

The Kwiatkowskis lived in a second floor apartment. They lost all of their possessions in the fire, with the exception of a wallet. Their uninsured loss, minus payments from the Red Cross and the Department of Human Resources, amounts to $5,670.86.

##### (4) Charles Wagner

Charles Wagner lived in a third floor apartment. He lost all of his personal possessions, none of which were covered by insurance. His loss amounts to $7,168.50, which excludes payment he received from Red Cross and a tax reduction.

##### (5) Ronald Bass

Ronald Bass is a firefighter who was seriously injured while suppressing the fire. He lost agility in his right wrist after falling backwards and landing on his outstretched arm during the fire. He will probably have to undergo surgery as a result of this injury. He has been unable to resume active firefighting duties since the date of the fire. In July 1993 he was placed on light desk duty at the Fire Department and then forced to leave the Department because of his inability to return to active duty.

Bass is entitled to restitution for his lost overtime pay. 18 U.S.C. § 3663(b)(2)(C). His loss was calculated by taking an average of the overtime he would have received absent his injury based on his overtime accrual during his last five years with the Fire Department. The estimated future cost of his medical expenses includes the cost for sur-

gery, less payments he is likely to receive from his health insurance carrier. The total loss is $16,385.15.

### (6) Thomas A. Ripley

Thomas A. Ripley was the owner of the building located at 66–45 Grand Avenue, where the arson occurred, as well as several surrounding buildings that suffered incidental damage. Restitution to him excludes all payments received from the insurance carrier. *See* 18 U.S.C. § 3663(e)(1). Loss is based upon the difference in value before and after the fire. It does not include loss of rent. Ripley's total loss amounts to $136,-131.20.

### (ii) Indirect Victims

#### (1) Cigna Fire Underwriters

Cigna provided insurance payment to the owner of the building. It is claiming $275,-453.89 in compensation. The claim covers actual out-of-pocket payments. 18 U.S.C. § 3663(e)(1); *United States v. Atkinson*, 788 F.2d 900 (2d Cir.1986) (payments to victims by third parties can be covered by ordinary restitution to third parties). This amount is approved.

#### (2) New York Fire Department

The New York Fire Department claims payment in the amount of $939,914.79. 18 U.S.C. § 3663(e)(1). This amount represents the Fire Department's payments for medical leave, funeral expenses and lost earnings of the deceased paid to his widow. The lost earnings are based on an eleven year work expectancy of $70,000.00 per year. In view of the probable increase in payments for firefighters over the likely work-life of the deceased, these payments are conservative.

### (iii) Total Payments

The total restitution amount to be paid by defendant comes to $1,455,799.79. Direct victims of the offense are to be paid restitution before payment of any of the indirect victims' claims. 18 U.S.C. § 3663(e)(1).

## XII. DISBURSEMENT OF FINES AND RESTITUTION

 Because defendant's assets are largely in the form of real estate holdings— either individually or in corporate names— the defendant's assets must be liquidated in order to satisfy the monetary components of his sentence. *See United States v. Serrano*, 637 F.Supp. 12 (D. Puerto Rico 1985) (real estate property ordered seized). The defendant shall supply to the United States Attorney's Office a copy of any contract of sale, mortgage, or other hypothecation of any of the real property in which the defendant has an interest within 48 hours of the event. The United States Attorney has the right to be present at any closing. Any net proceeds from sale, mortgage or hypothecation shall be maintained in an escrow account by defendant's counsel, Vivian Shevitz, Esq., for the purpose of satisfaction of the fines and restitution ordered. A protective stay previously obtained by the United States remains in effect.

Restitution amounts are to be delivered to the United States Attorney's Office, Eastern District of New York, One Pierrepont Plaza, 14th Fl., Brooklyn, New York, 11202, Attn: Financial Litigation Unit, for transfer to the victims. 18 U.S.C. § 3663.

## XIII. SPECIAL ASSESSMENTS

A special assessment of $50.00 is imposed for each of the nineteen counts. The total sum is $950.00. 18 U.S.C. § 3013(a)(2)(A).

## XIV. SUPERVISED RELEASE

Guidelines § 5D1.1(a) and § 5D1.2(b)(2) require a term of supervised release for counts 1 and 3 through 19 of at least 2 but not more than 3 years. On count 2, the Guidelines provide for a term of supervised release of at least 3 but not more than five years. U.S.S.G. § 5D1.1(a) and § 5D1.2(b)(1).

For counts 1 and 3 through 19, the court imposes the maximum term of 3 years of supervised release. 18 U.S.C. § 3583(a) and § 3583(b)(2). The maximum 5 year term of supervised release is imposed on count 2. 18 U.S.C. § 3583(a) and § 3583(b)(1). All supervised release terms will be served concurrently.

## XV. CONCLUSION

The defendant is sentenced to 435 months imprisonment and five years supervised release for the offense of arson resulting. in death; five years imprisonment and three years supervised release for conspiracy to commit arson, concurrently; five years imprisonment and three years supervised release for each count of mail fraud, concurrently; and ten years imprisonment and three years supervised release for tampering with a witness, concurrently. Because of the nature of the offense, the court imposes the maximum sentence on each count.

■ A total amount of $950.00 special assessment shall be paid by defendant for all nineteen counts. This assessment shall have first priority in payment from defendant's assets. *Thibodo v. United States*, 187 F.2d 249, 257 (9th Cir.1951).

Second in priority is payment for costs of incarceration, and monthly support to the defendant's child and former spouse as described below. Third in priority is restitution to the direct victims—Ripley, the Anthonys, Wagner, the Kwiatkowskis, the Corteses, and Ronald Bass. Fourth in priority is restitution to the indirect victims—Cigna Fire Underwriters and the New York Fire Department. Fifth in priority is the fine payment based upon twice the total restitution. U.S.S.G. § 5E1.1(c) (payments applied first toward restitution, then toward any fine imposed); *cf. United States v. Ahmad*, 2 F.3d 245 (7th Cir.1993) (priority for victims does not excuse imposition of a fine).

There are more than enough assets to cover all amounts ordered paid. Defendant shall pay in advance for the cost of his incarceration $318,037.57 to be kept by the Clerk of the Court in an interest bearing account in escrow and paid to the United States Attorney at the rate of $1,779.33 per month, including months already served. Upon defendant's death or release, all sums remaining in this account shall be payable to his estate or to him.

Should the probation department certify on any month that the defendant does not have sufficient assets to pay the cost of support to his former wife and child in the amount of $1,500, or such amount as is required to make up the $1,500 a month, the Clerk will pay up to $1,500 for the support of the wife and child pursuant to the defendant's agreement with his former wife (or court of support). Should the amount required for support be reduced, the payment from the escrow account shall be reduced. After payment, if any, of support the remainder of the $1,779.33 monthly payment shall be credited to the United States for the cost of incarceration.

A total restitution amount of $1,455,799.79 shall be paid to the victims as follows: $56,569.40 to Michelle and Shelly Anthony; $18,506.00 to Estelle and William Cortes; $5,670.86 to Zbigniew and Jaowica Kwiatkowski; $7,168.50 to Charles Wagner; $16,385.15 to Ronald Bass; $136,131.20 to Thomas A. Ripley; $275,453.89 to Cigna Fire Underwriters; and $939,914.79 to the New York City Fire Department.

Defendant shall pay a fine of $2,911,599.58 for the offense of arson resulting in death. All other fines would be concurrent if imposed.

A stay of the judgement of conviction is granted pending appeals. The defendant shall supply to the United States Attorney a copy of any contract of sale, mortgage, or other hypothecation of. any of the real property or other property in which the defendant has an interest within 48 hours of the event. The United States Attorney has the right to be present at any closings. Any net proceeds from such sale, mortgage or hypothecation shall be maintained in escrow by Vivian Shevitz, Esq., pending appeals, for the purpose of satisfaction of the fines, restitution and other payments ordered. The government may move for seizure of defendant's assets or for other relief pending the appeal if its rights or that of the restitutees are in danger of being circumvented by the defendant or his associates.

Stays presently in force shall remain in force. The parties shall furnish a comprehensive order containing those stays within 48 hours.

SO ORDERED.